**Russell LEDBETTER, Petitioner–Appellee,**

v.

**Ron EDWARDS, Warden, Respondent–Appellant.**

No. 93–4227.

United States Court of Appeals, Sixth Circuit.

Argued May 10, 1994.

Decided Sept. 21, 1994.

Christopher Ragonesi, Dinsmore & Shohl, Cincinnati, OH (argued and briefed), for Russell Ledbetter.

Donald G. Keyser, Asst. Atty. Gen., Columbus, OH (argued and briefed), for Ron Edwards.

David H. Hoffman, Clermont County Pros. Atty., Batavia, OH (briefed), for Office of the Pros. Atty. for Clermont County, Ohio, amicus curiae.

Before: KRUPANSKY, BOGGS and SUHRHEINRICH, Circuit Judges.

BOGGS, Circuit Judge.

The State of Ohio appeals from the district court's decision, on two separate grounds, to issue a writ of habeas corpus on behalf of Russell Ledbetter. For the reasons set forth below, we reverse on both grounds.

# I

Ledbetter had been indicted by an Ohio grand jury on one count of kidnapping, one count of abduction, one count of robbery, one count of theft, and two counts of having a weapon while under disability. The kidnapping, theft, and robbery charges were tried by jury in July 1988, and resulted in the jury finding Ledbetter guilty of abduction with

respect to the kidnapping count, and guilty of robbery and theft.[1] He was sentenced in November 1988, and the Ohio Court of Appeals affirmed the judgment in October 1989. The Supreme Court of Ohio dismissed his appeal, without opinion, in February 1990. He then brought this habeas case, pursuant to 28 U.S.C. § 2254.

The charges against Ledbetter arose from the events surrounding the abduction of Nancy Clark from the parking lot of the Eastgate Mall in Clermont County, Ohio on May 14, 1987. Clark arrived at the mall shortly after 5:00 p.m. that day, driving alone in a 1987 Voyager van. As she was parking, she noticed "a greenish-yellow car that [she] pulled up right behind." She saw a man "slumped down" in the driver's seat of the car watching her through the outside rear-view mirror.

Clark went into the mall for approximately fifteen minutes. When she returned to her van, she noticed that the greenish-yellow car was no longer parked in front of her vehicle. Rather, the car was now parked to her right. No one was in that car. Clark began to drive out of the parking lot. As she turned onto the access road, a man arose from behind her seat and grabbed her around the neck. The man told Clark "not to stop and that he had a gun and if [she] didn't do what he said he would shoot [her]." He later threatened her with a knife and told her that he had a friend watching.

Clark was extremely "excited" and scared, fearing that she might be killed. She tried to get a good look at her abductor so that she would be able to later identify him if she "live[d] through this." Clark saw the man in the rear-view mirror. Although she primarily saw the section of the man's face above his mouth, she saw enough of his face below his mouth to discern that he had a few days' growth of facial hair. When the man saw that Clark was gazing at him, he "slapped the mirror down" with his free hand. At that point, Clark realized that the man did not have a weapon within easy access.

---

1. Subsequently, the two weapons counts were dismissed, and Ledbetter entered a guilty plea with respect to another abduction count.

Clark continued driving. Soon she reached an intersection, pulled in front of another car, and "popped the clutch." Her abductor was thrown off balance, enabling her to escape from the van. As she darted out, she looked back in an effort to see her abductor one more time. She saw the man restart the van, reach out and shut its door, and drive away. Clark testified that she again saw the man's face briefly when she looked back at him.

Clark stated that her abductor had been wearing black mesh "biker gloves" and a black thermal underwear shirt. She testified that "[h]e was not cleanly shaven, but he did not have a heavy beard, I would say maybe two or three days growth with a mustache." Clark stated that the man's most distinctive features were his eyes and nose. What she remembered "most of all" was that the man's eyes were "kind of offset" and his nose "was bridged."

At 9:30 p.m., approximately four and a half hours after the incident occurred, a police officer came to Clark's home with a photographic array of five persons that included a picture of Ledbetter with a beard. Clark looked at the pictures for approximately ten minutes and was unable to identify anyone positively. However, she did indicate to the officer that one picture captured characteristics of her abductor. Nevertheless, she explained that she was "sorry," but she "didn't feel good about making a positive ID because of the beard." That is, she was sure that her abductor had only a few days' facial growth. The police officer then told Clark that the photograph toward which she had inclined was that of Ledbetter, the suspect.[2]

Four days later, the police presented Clark with another photographic array. This time, the array included a picture of Ledbetter without a beard. Clark looked at the pictures for less than two minutes and identified the Ledbetter photograph as that of her

abductor. Later, at trial, Clark identified him in person.

Clark's van was recovered at a nearby business on the day after her abduction. At the crime scene, she showed the police the greenish-yellow car she had observed parked next to her van at the mall. The car was registered to Robin DeVoe. DeVoe lived in the same apartment complex as Ledbetter, and her apartment was directly above Ledbetter's. She testified that Ledbetter borrowed her car every so often and had done so on the day of Clark's abduction, taking the keys from her apartment.

Gregory Murphy was Ledbetter's friend in May 1987. Murphy corroborated DeVoe's testimony that Ledbetter had borrowed De-Voe's car on the day of the abduction, when Clark saw it parked at Eastgate Mall. Murphy also testified that Ledbetter had shown him a brown purse, which contained credit cards in the name of Nancy Clark. Murphy stated that Ledbetter had told him how he had obtained the purse: "[h]e was outside the mall and saw a girl"; he "got in [her] van and waited for her to come out of the store"; he "got her from behind"; and "he took off with the van and her purse." Murphy volunteered this information to the police after he was arrested on a "bad check charge" a few days after the incident.

Five weeks later, at around 12:00 midnight, Ledbetter was arrested at his sister's residence.[3] Detective McMillan of the Union Township Police Department advised him of his *Miranda* rights, reading from a card. Ledbetter was cooperative. He was then transported to the Union Township police station, where McMillan questioned him in an interview room. Detective Zinser was present as an observer. Prior to the interview, Ledbetter was again informed of his *Miranda* rights from a Notification of Rights Form, and he was given a copy of the form to follow as the rights were read to him. As

---

**2.** Ledbetter apparently emerged as an early suspect after Clark identified the greenish-yellow vehicle to the police. The police had had prior incidents with that vehicle, and they knew that Ledbetter drove it with some frequency.

**3.** A month earlier, only two days after the abduction, Ledbetter had voluntarily accompanied a

police officer to the Union Township police station in Clermont County and had given a taped statement, denying involvement in the abduction. He also voluntarily complied with the officer's request to search his apartment and to take his photograph and fingerprints and samples of his hair.

McMillan went through each of the rights, Ledbetter wrote his initials next to each portion. He then signed the waiver of his rights. He did not indicate at any time that he did not understand his rights or that he wished to have an attorney present.

The interrogation began at 12:25 a.m. and continued for approximately three hours. However, the police tape-recorded only the final half hour of the interview. Officer McMillan explained:

[I]t's a matter of how the interview is being conducted. What you try to do is establish a bond of trust between you and the offender. By turning on the tape recorder it kind of puts him on notice and generally speaking a suspect would not be too cooperative with the officer and would hold back on certain information. It's more a threat to the offender than it is to anything else.

. . . .

. . . I've known Mr. Ledbetter for a period of time, and we've always had a rapport, and so in order not to jeopardize that rapport, I told [him] I wanted to just sit down and have a talk with him and we would discuss some things. And after I obtained the confession I decided to reduce it down to a tape recorded statement.

Before Ledbetter gave his tape-recorded confession, he was advised a third time of his *Miranda* rights.

During the unrecorded portion of the interview, Ledbetter apparently began his side of the conversation by claiming that he had been somewhere else with Murphy at the time that the alleged abduction took place. Detective McMillan then employed various psychological tactics and misrepresentations to convince Ledbetter to confess his involvement. First, Detective McMillan showed Ledbetter two enlarged photographs of a latent fingerprint that the officer claimed had been recovered from the victim's van, and a fingerprint that had allegedly been obtained from Ledbetter, together with a chart indicating that a fingerprint expert had made a "14 point comparison" between the latent and the identified fingerprints. In fact, the fingerprints were not Ledbetter's, and no expert had made any such comparison. When

he was informed of the purported fingerprint evidence, Ledbetter responded that he did not understand how his prints could have come from the van. However, he conceded for the first time that he "may have been up in the mall area."

Detective McMillan also falsely told Ledbetter that the female victim and two other witnesses had identified him from a photographic array. In fact, no witness had identified him. Detective McMillan would later admit that the information he had presented to Ledbetter about his having been identified from photographic arrays had been a "blatant lie."

Finally, McMillan told Ledbetter that the victim was waiting outside the interview room, prepared to identify her assailant. In fact, Clark was not at the police station. Instead, McMillan set up a female dispatcher to stand in front of a two-way mirror that could be seen from the interview room. The office lights were turned on and the blinds on the mirror were opened so that Ledbetter would see, from his vantage point inside the interview room, a woman's silhouette appearing at the window. McMillan left the interview room and returned approximately fifteen minutes later. He told Ledbetter that the victim had observed him through a mirror, that she had made a positive identification, and that she was sure that Ledbetter was the person who had abducted her. At that point, Ledbetter "broke down in tears and started crying, said he was sorry for the way it happened, the way it had taken place, that he wanted to come clean and he wanted to make a new start for himself."

Ledbetter confessed just before 3:00 a.m. Detective Zinser testified:

He told us that he was in fact at Eastgate Mall with this vehicle registered to Robin DeVoe, and he told us that he saw the victim, Nancy Clark, drive up and get out of her van. He found her to be quite attractive and he had noticed that the van had been unlocked and he got in to the back of the van and waited for her to come out. Pretty much the way the victim tells it that she got back in the van and he came up from around her and grabbed her from

around the neck and he told us that he told her all he wanted was a ride and that he wasn't going to hurt her, although he would if she didn't cooperate.

Ledbetter's confession was introduced as evidence against him at trial.

According to the detectives, during the entire interview, Ledbetter never showed a reluctance to talk, nor did he indicate that he wanted an attorney present. When Ledbetter was informed of his *Miranda* rights for a third time, immediately prior to giving his recorded confession, he indicated that "[i]t would be nice" to have an attorney present. The detectives further emphasized that, during the interview, Ledbetter was allowed to obtain food, drinks, and cigarettes, and to go to the bathroom. McMillan insisted that a "whole rapport" between him and the suspect had developed during the interview.

Based on the totality of the circumstances under which Ledbetter's confession was elicited, the district judge adopted the magistrate judge's Report and Recommendation ("R & R") and agreed that a writ of habeas corpus should be issued. Furthermore, the court adopted the R & R's separate suggestion that a writ be issued in light of the circumstances under which the police obtained Nancy Clark's positive identification of Ledbetter during the second photographic array.[4] This timely appeal by the government followed.

## II

The Fifth Amendment prohibits the prosecution's use of a defendant's compelled testimony. *Oregon v. Elstad,* 470 U.S. 298, 306–07, 105 S.Ct. 1285, 1291–92, 84 L.Ed.2d 222 (1985). The Due Process Clause of the Fourteenth Amendment also prohibits the admission of coerced confessions procured by means "so offensive to a civilized system of justice that they must be condemned." *Miller v. Fenton,* 474 U.S. 104, 109, 106 S.Ct. 445, 449, 88 L.Ed.2d 405 (1985). An admission is deemed to be coerced when the conduct of law enforcement officials is such as to overbear the accused's will to resist. *Beckwith v. United States,* 425 U.S. 341, 347–48, 96 S.Ct. 1612, 1616–17, 48 L.Ed.2d 1 (1976) (quoting *Rogers v. Richmond,* 365 U.S. 534, 544, 81 S.Ct. 735, 741, 5 L.Ed.2d 760 (1961)).

An involuntary confession may result from psychological, no less than physical, coercion by law enforcement officials. *Arizona v. Fulminante,* 499 U.S. 279, 285–89, 111 S.Ct. 1246, 1252–53, 113 L.Ed.2d 302 (1991); *Miranda v. Arizona,* 384 U.S. 436, 448, 86 S.Ct. 1602, 1614, 16 L.Ed.2d 694 (1966).[5] However, not all psychological tactics are unconstitutional. In determining whether a confession has been elicited by means that are unconstitutional, this court looks at the totality of the circumstances concerning "whether a defendant's will was overborne in a particular case." Factors to consider in assessing the totality of the circumstances include the age, education, and intelligence of the accused; whether the accused has been informed of his constitutional rights; the length of the questioning; the repeated and prolonged nature of the questioning; and the use of physical punishment, such as the deprivation of food or sleep. *Schneckloth v. Bustamonte,* 412 U.S. 218, 226, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973).

---

**4.** The district court also adopted the R & R's recommendation that a writ not be issued based on any of the five other grounds raised by Ledbetter.

**5.** In *Colorado v. Connelly,* the Court offered a litany of examples of outrageous forms of psychological pressures that are coercive. Thus, the Court has held it unlawful to: (1) subject a suspect to four hours of questioning while he is incapacitated and sedated in an intensive-care unit; (2) interrogate a suspect, who is on medication, for over eighteen consecutive hours without allowing him food or sleep; (3) hold a gun to a suspect's head in order to extract a confession; (4) subject a suspect to sixteen consecutive days of incommunicado interrogation, in a closed cell without windows, while limiting the suspect's access to food; (5) hold a suspect incommunicado for three days with little food, and then extract his confession by warning him that the chief of police is preparing to admit a lynch mob into the jail to fetch him; and (6) question a suspect by alternating officers for thirty-six consecutive hours, without allowing him to sleep. 479 U.S. 157, 163 n. 1, 107 S.Ct. 515, 520 n. 1, 93 L.Ed.2d 473 (citations omitted).

In *Frazier v. Cupp*, the Court held that a confession was voluntary, despite a police officer's misrepresentation to the petitioner that an associate had confessed to the crime. 394 U.S. 731, 737–39, 89 S.Ct. 1420, 1423–25, 22 L.Ed.2d 684 (1969). Apparently, the petitioner had received partial warnings of his *Miranda* rights prior to making any incriminating statements. Furthermore, he was an adult of normal intelligence. In the Court's view, "The fact that the police misrepresented the [codefendant's] statements ... is, while relevant, insufficient in our view to make this otherwise voluntary confession inadmissible." *Id.* at 739, 89 S.Ct. at 1425.

By contrast, in *Spano v. New York*, 360 U.S. 315, 322, 79 S.Ct. 1202, 1206–07, 79 L.Ed.2d 1265 (1959), a pre-*Miranda* case, the Court held that a confession had been involuntary. In that case, a police officer whom the suspect knew as a close childhood friend persuaded the suspect that the officer might be fired if the suspect did not cooperate with him by giving a confession. Basing its opinion on the totality of circumstances, the Court noted that the confession was obtained after eight hours of continuous questioning by many law enforcement officials, including a skillful prosecutor, from early evening until almost sunrise. Furthermore, the questioning continued despite the suspect's repeated requests to contact his attorney. *Id.* at 318–19, 79 S.Ct. at 1204–05. Throughout the questioning, he followed his attorney's prior instructions not to answer any questions. Only after four lengthy sessions did he finally agree to make a statement. *Id.* at 319, 79 S.Ct. at 1204–05.

In *Lynumn v. Illinois*, 372 U.S. 528, 83 S.Ct. 917, 9 L.Ed.2d 922 (1963), the suspect confessed only after the police repeatedly misrepresented to her that state financial aid for her children would be cut off and that her children would be taken from her if she did not cooperate. *Id.* at 534, 83 S.Ct. at 920–21. The suspect had no previous experience in criminal law and had no reason to doubt the officers' power and intention to carry out their threats. Furthermore, the threats were made while three police officers encircled the suspect in her apartment. Under the totality of those circumstances, the Court

found that her confession had been coerced. *Ibid.*

In *United States v. Rigsby*, 943 F.2d 631 (6th Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1269, 117 L.Ed.2d 496 (1992), this court affirmed the conviction of a defendant who confessed to police only a few hours after his arrest. During the arrest, the police had warned him that his head would be "busted in" if he turned around. However, this court held that the confession, which was given later, in the presence of the suspect's mother, had not been induced by the earlier threat of violence. *Id.* at 634.

In *McCall v. Dutton*, 863 F.2d 454 (6th Cir.1988), *cert. denied*, 490 U.S. 1020, 109 S.Ct. 1744, 104 L.Ed.2d 181 (1989), this court held that a habeas appellant's confession had been voluntary, even though the police interrogation continued while the defendant was handcuffed, placed on the ground, and surrounded by numerous officers who yelled and pointed weapons at him. *Id.* at 459. The court reached its conclusion by considering the totality of the circumstances. Furthermore, in the course of its opinion, the *McCall* court twice cited with approval *Hawkins v. Lynaugh*, 844 F.2d 1132 (5th Cir.), *cert. denied*, 488 U.S. 900, 109 S.Ct. 247, 102 L.Ed.2d 236 (1988).

In *Hawkins*, a defendant who had been sentenced to death sought habeas relief, claiming in part that his confession had been given involuntarily over the course of an eighteen-hour period, during which he had been questioned several times. In all, he had been interrogated at one point or another by up to eleven different police officers between 11:30 a.m., the time when he had been arrested, and 6:00 a.m. the next morning. During all that time, the police tape-recorded only one hour of their conversations with the defendant. Even though the defendant ultimately confessed to his capital crimes in the early morning, the court held:

> Although the interrogation lasted into the early morning hours, Hawkins himself made the decision to "get it over with" rather than to return to his cell for rest, and he was not deprived of refreshment. . . . Furthermore, Hawkins was in no physical discomfort.

There is little doubt but that the officers were hoping for psychological advantage by their tactics, such as sending in a black officer to play to Hawkins['s] professed dislike for "honkies" and their studiously relaxed questioning and expressions of understanding. However, there is nothing inherently wrong with efforts to create a favorable climate for confession. Neither "mere emotionalism and confusion," nor mere "trickery" will alone necessarily invalidate a confession.

*Id.* at 1140, *cited in McCall,* 863 F.2d at 459, 460.

■ In this case, in examining the totality of circumstances that surrounded the interrogation of Ledbetter, the magistrate judge, whose 43–page R & R was adopted by the district court without any modification, identified various factors that could support a finding that Ledbetter's confession had been offered voluntarily. Thus, voluntariness could be upheld based on the facts that: (1) no physical punishment or threats had been used; (2) Ledbetter had not been deprived of physical necessities, such as food and drink, and had been allowed to go to the bathroom; (3) the interrogation had not been unduly lengthy in duration; (4) Ledbetter had been informed of his *Miranda* rights on three different occasions during the night of his interrogation; (5) he had clearly indicated that he understood his rights and did not appear to be under the influence of drugs or alcohol or otherwise unable to comprehend those rights; (6) he had not expressed reluctance to talk; and (7) he had not requested the presence of an attorney.

However, the district court found that, despite those circumstances, other circumstances contributed to an atmosphere of coercion, "particularly in light of the impact of the staged victim identification": (1) the interrogation had occurred from midnight into the early morning hours; (2) the portion of the interrogation during which the police had engaged in trickery had not been recorded; (3) insufficient evidence had been proffered at trial regarding Ledbetter's intelligence, education, or experience in dealing with the criminal justice system; and (4) no

attorney had been present to offset the deception employed by the police officers.

■ This court reviews a trial court's interpretations of law *de novo. United States v. Sangineto–Miranda,* 859 F.2d 1501, 1512 (6th Cir.1988). In this case, the district court was concerned that the questioning of Ledbetter had extended from midnight through 3:00 a.m. However, this court expressly approved the overnight interrogation of Hawkins, who was questioned much longer, until 6:00 in the morning, and whose confession made him death-eligible. Second, the district court in this case was concerned that only a portion of the police interrogation of Ledbetter had been tape-recorded. However, this court expressly approved the Hawkins interrogation, even though only one hour of those conversations was taped. Third, the district court was concerned that insufficient evidence had been proffered at trial regarding Ledbetter's prior experience with the criminal justice system. However, the record before that court included the opinion of the Ohio Court of Appeals, which explicitly found that:

> [A]ppellant *is an adult with experience in the criminal law process.* Appellant was in command of his mental faculties and was not subject to an unreasonable interrogation. In addition, the record is devoid of any indication of physical abuse or harsh conditions. Therefore, the totality of the circumstances establishes that appellant's statements were completely voluntary and of his own volition.

J.A. at 146–47 (emphasis added). This state court finding has not been shown to be erroneous by convincing evidence. Thus, it must be presumed to be correct. *Sumner v. Mata,* 455 U.S. 591, 102 S.Ct. 1303, 71 L.Ed.2d 480 (1982) (per curiam); 28 U.S.C. § 2254(d).

■ Finally, the district court was concerned that no attorney had been present during the police conversations with Ledbetter. However, he had been apprised of his *Miranda* rights three separate times; yet he did not formally request an attorney. Recently, in *Davis v. United States,* —— U.S. ——, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994), the Supreme Court held that "if a suspect

makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, our precedents do not require the cessation of questioning.... Rather, the suspect must unambiguously request counsel." *Id.* at ——, 114 S.Ct. at 2355. In *Davis,* a suspect said to his questioners during an interrogation, "Maybe I should talk to a lawyer." The Court held that such a statement was too ambiguously worded to require that questioning cease. Here, Ledbetter's statement that "[i]t would be nice" to have an attorney was even more ambiguous.

*Schneckloth* teaches that the key issue is whether a confession arises from the defendant's will being overborne. In the Supreme Court cases that best support defendant's position, *Spano* and *Lynumn,* the circumstances pointed much more strongly to a false confession dictated by an overbearing of the will than do the circumstances in this case. In *Lynumn,* the concern was outright fear of adverse consequences, elimination of government benefits, which may be just as real as the physical fear of adverse consequences in outright torture. In *Spano,* the concern was for adverse consequences to the defendant's police officer friend. In our case, the only adverse consequences being presented to the defendant were the results of ultimately being convicted of the crime. A defendant who is completely innocent might well confess in the circumstances of *Spano* or *Lynumn,* for fear of the extraneous adverse consequences. By contrast, an innocent defendant in the circumstances in our case would have little incentive to render a false confession. A defendant's will is not overborne simply because he is led to believe that the government's knowledge of his guilt is greater than it actually is.

In light of the totality of the circumstances, we hold that the district court committed error in adopting the legal analysis of the magistrate judge. A careful look at this case in the light of the *Schneckloth* factors shows that Ledbetter had prior experience with the criminal justice system and was sufficiently intelligent to appreciate the les-

sons of that experience; had been amply notified of his constitutional rights; had been questioned for a reasonable amount of time; and had been allowed the necessary creature comforts that *Schneckloth* anticipates. Therefore, we hold that Ledbetter's confession was obtained by means of legitimate law-enforcement methods that withstand constitutional scrutiny.

### III

■ The district court found that Nancy Clark's identification of Ledbetter's clean-shaven face at the second photographic array had resulted from an unduly suggestive process that resulted in a "substantial likelihood of irreparable misidentification," and that therefore the admission of Clark's identification testimony at trial and the testimony about her earlier photo identification violated Ledbetter's right to due process of law.

■ A conviction based on identification testimony that follows a pretrial identification violates the defendant's constitutional right to due process whenever the pretrial identification procedure is so "impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Thigpen v. Cory,* 804 F.2d 893, 895 (6th Cir.1986), *cert. denied,* 482 U.S. 918, 107 S.Ct. 3196, 96 L.Ed.2d 683 (1987) (quoting *Simmons v. United States,* 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968)). It is the likelihood of misidentification that violates the defendant's due process right. *Neil v. Biggers,* 409 U.S. 188, 198, 93 S.Ct. 375, 381–82, 34 L.Ed.2d 401 (1972). The due process concern is heightened when that misidentification is possible because the witness is called upon to identify a stranger whom she has observed only briefly, under poor conditions, and at a time of extreme emotional stress and excitement. *See Manson v. Brathwaite,* 432 U.S. 98, 112, 97 S.Ct. 2243, 2251–52, 53 L.Ed.2d 140 (1977); *Simmons,* 390 U.S. at 383–84, 88 S.Ct. at 970–71; *United States v. Russell,* 532 F.2d 1063, 1066 (6th Cir.1976).

■ In assessing the validity of a pretrial identification, this court follows a two-step analysis. The court first considers

whether the procedure was unduly suggestive. *Thigpen,* 804 F.2d at 895. The defendant bears the burden of proving this element. *United States v. Hill,* 967 F.2d 226, 230 (6th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 438, 121 L.Ed.2d 357 (1992). If the court does find that the procedure was unduly suggestive, it next evaluates the totality of the circumstances to determine whether the identification was nevertheless reliable. *Id.; see also Biggers,* 409 U.S. at 199–200, 93 S.Ct. at 382–83; *Thigpen,* 804 F.2d at 895. Five factors that are considered in assessing the reliability of the identification include: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness's degree of attention at the time of observation; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated by the witness when confronting the defendant; and (5) the length of time between the crime and the confrontation. *Manson,* 432 U.S. at 114, 97 S.Ct. at 2253; *Biggers,* 409 U.S. at 199–200, 93 S.Ct. at 382–83.

The district court held that the procedure used to obtain Clark's pretrial identification had been unduly suggestive. Because a police officer had told Clark that the bearded Ledbetter, toward whose photograph she had already inclined during the first array, was the government's suspect in her abduction, the district court found that Clark was "thereafter apt to retain in her memory the photographic image of her alleged abductor rather than [that] of the person she actually saw at the time of the crime." Moreover, the court found that Clark had only had a limited opportunity to view her abductor during the crime. Although Clark had testified that she had tried to get a good look at her abductor in order to identify him later for the police, the district court found it unlikely that she had paid close attention to detail. Moreover, the court found that Clark had been too "excited" and distraught at the time of the abduction to focus her attention adequately on her assailant's physical appearance. The court also found that "[t]he presence of the beard should not have posed a significant problem for making an identification" because Clark had stated that the most distinctive features of her assailant were his nose

and eyes, not his mouth or chin. Furthermore, the court found that "[a]lthough only a short period of time elapsed between the crime and the initial confrontation, Clark was unable to identify petitioner from the initial array." Therefore, it found that the admission at trial of Clark's in-court identification testimony, and Clark's pretrial identification of petitioner from the second photographic array, had deprived Ledbetter of his constitutional right to due process of law.

The state courts that considered this case, both at the trial and appellate level, made factual determinations concerning the victim's identification. The district court cannot write on a clean slate with regard to these same facts. Indeed, "[t]hese factual determinations of either trial or appellate courts are not to be overturned unless they are not 'fairly supported by the record.' 28 U.S.C. § 2254(d)(8)." *Hart v. Marion Correctional Inst.,* 927 F.2d 256, 257 (6th Cir.) (citation omitted), *cert. denied,* —— U.S. ——, 112 S.Ct. 70, 116 L.Ed.2d 44 (1991). *See Sumner v. Mata,* 449 U.S. 539, 547, 101 S.Ct. 764, 769, 66 L.Ed.2d 722 (1981). Thus, when we review the district court's determination and findings of fact, we must be sensitive to whether it committed error by not according proper deference to the state court findings. After reviewing the record, we can confidently hold that the district court was clearly erroneous in its analysis of the circumstances leading to Clark's identification of Ledbetter's clean-shaven face during the second photographic array and in rejecting the state court findings, J.A. at 149, that this identification was not unreliable because of unduly suggestive circumstances.

From the very first time that she was interviewed, Nancy Clark stated firmly that she knew what her abductor looked like. She perceived distinctive features in his eyes and nose. The record shows that:

(1) Clark had the opportunity to peer into her assailant's eyes; he was as close as her rear-view mirror. However, even a close-up look would not necessarily have enabled her to identify a bearded version of the abductor if his face was merely dotted with a few days' growth, as she testified that it was. On the

other hand, a few days' stubble on the assailant's face would not have interfered dramatically with her ability to recognize a photograph of Ledbetter clean-shaven.

(2) Clark's attention was riveted to the visage she saw in the rear-view mirror. Indeed, the salient fact that the assailant struck at the rear-view mirror after Clark began staring into it reflects the assailant's concern that his victim was peering too attentively at his features. She believed that the man might kill her. It is clearly erroneous to suggest that she had other things on her mind at the time that would have prevented her from remembering the face of the man sitting behind her, clutching her throat. Although she was certainly "excited" during the ordeal, her concentrated effort to remember her abductor's face was further evidenced when she paused after escaping from the van in order to look back at that face one more time.

The district court made a great deal of Clark's excited state when she first encountered a police officer after she escaped from her abductor. However, she certainly had reason to be excited, having just been surprised and assaulted while on a peaceful shopping excursion. Indeed, she then displayed great presence of mind in staging a near-accident and escaping from her abductor. She further specifically was aware that defendant had told her that he had a confederate who was observing the crime and would kill her if she escaped. Finally, the person whom she encountered after her escape, who told her that he was an officer, was by his own testimony not only in plain clothes but looked rather disreputable. Given this background, the victim's agitated state and her repeated requests that the plain-clothes officer reassure her by displaying a badge do not in any significant way detract from all of the other circumstances that indicate her very remarkable presence of mind and mental acuity.

(3) Clark was attentive to detail, as was shown by her accurate description of the greenish-yellow vehicle that had parked in front of, and then alongside, her van at the Mall.

6. Ironically, if Clark *had* successfully and un-

In *United States v. Hill,* 967 F.2d at 233, this court held that a bank teller's in-court identification was reliable even though *five years* had passed since the witness had last seen the defendant at the bank robbery that he had allegedly perpetrated. That testimony was deemed reliable even though the teller "had *only a couple of minutes* to view a robber who was disguised with a *ball cap, sunglasses, and a bandage on his nose.*" *Id.* at 232 (emphasis added). By contrast, in this case, Clark saw an undisguised face and identified it four days later.

Similarly, in *United States v. Causey,* 834 F.2d 1277 (6th Cir.1987), *cert. denied,* 486 U.S. 1034, 108 S.Ct. 2019, 100 L.Ed.2d 606 (1988), this court upheld a witness's in-court identification of a defendant who objected that the witness had been suggestively shown single photos of him for identification, thus making her identification suspect. *Id.* at 1284. Nevertheless, this court held that the in-court identification was admissible as evidence, even though the record indicated that the witness had been *as far as twenty to thirty feet* away from the defendant at the time that she saw him leave the site of the bank robbery that he allegedly staged. *Id.* at 1285. Indeed, this court held that other witnesses who were unable to pick out the defendant from a photo array prior to trial, could also identify him in court: "The prior failure of the witness to identify the defendant goes only to the weight to be accorded testimony, not its admissibility." *Id.* at 1286.

▇▇▇ Even if the second array were unduly suggestive, an analysis of the totality of the circumstances under the *Biggers* test still assures us that there was no substantial likelihood of misidentification in this case. First, Clark had the unimpeded opportunity to view Ledbetter at the time of the crime. Second, she devoted her full attention to Ledbetter's face as she stared at it from a very close range. Third, she accurately described aspects of his appearance, inclining towards his photograph but refusing to identify him positively because her abductor had not been bearded.[6] Fourth, she expressed certainty at the first array that her abductor had not been bearded, and she identified the un-

equivocally identified the photograph of a beard-

bearded face of Ledbetter in less than ninety seconds during the second array. Likewise, she accurately identified the greenish-yellow car that the police traced back to Ledbetter as the vehicle she had seen prior to her abduction. Finally, she correctly rejected the hirsute visage in the first array, identifying instead the clean-shaven face during the second array, both within days of the crime. Therefore, although we agree that the officer at the first array acted improperly, we nevertheless hold that Clark's identification of Ledbetter withstands a *Biggers* analysis.

## IV

For the foregoing reasons, we REVERSE the decision of the district court to issue a writ of habeas corpus for the petitioner-appellee.

ed Ledbetter at the first array, it is conceivable that Ledbetter would now be contesting the array on the grounds that he had not been bearded at the time of the crime.