**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Paul B. GOIST, Defendant–Appellant.**

**No. 01–4211.**

United States Court of Appeals,
Sixth Circuit.

March 7, 2003.

Before MOORE and COLE, Circuit Judges;  and SARGUS, District Judge.*

* The Honorable Edmund A. Sargus, Jr., United    States District Judge for the Southern District

SARGUS, District Judge.

Defendant–Appellant Paul B. Goist ("Goist") appeals his conviction on two counts of unarmed bank robbery in violation of 18 U.S.C. § 2113(a). Goist raises two issues on appeal, the first contending that the district court erred by permitting suggestive show-up evidence and subsequent in-court identifications to be presented to the jury. Goist also contends that the district court erroneously admitted a statement given by him in violation of his Fifth and Sixth Amendment rights. For the reasons that follow, the judgment of the district court is **AFFIRMED.**

## I.

Goist was convicted on Count I of the indictment which charged him with the unarmed robbery of the First Federal Bank of Youngstown in Austintown, Ohio. According to the testimony, a man walked up to bank teller Elizabeth Menhart and placed a note on the counter demanding "$50s, $20s, and $100s." The teller gave the man $1,710.00. Menhart estimated that the bank robber was at her window for less than one minute. Menhart described the perpetrator as a male, unshaven, dark haired, twenty-five to thirty-five years old, 5'8" to 5'11" in height, wearing dark glasses, a light colored T-shirt under mechanic's overalls, and a dark baseball cap with a white bill.

The perpetrator was also observed by Security Officer Charles Purdy who ran outside after the robbery. Purdy testified that he saw the robber turn the corner and drive away in an older white Mercury or Marquis with darkened or covered license plates. He described the car as "a big, white-colored car like in the 1980's." (J.A. at 278.) Neither Menhart nor Purdy could identify the bank robber at trial. No witnesses were able to identify Goist relative

of Ohio, sitting by designation.

to the November 10, 2000 bank robbery. A bank surveillance camera photographed the teller and the robber. Menhart testified that she saw the robber's face for only "a little bit" and could make no positive identification from a photo array shown to her by an FBI agent.

Subsequently, Goist's fingerprints were found on the note given to the bank teller. Goist also gave eighty-seven handwriting exemplars which were then analyzed by the FBI laboratory. James Taylor from the FBI testified that the demand note and handwriting exemplars given by Goist shared similar characteristics. Nonetheless, Taylor was unable to conclude affirmatively that the same person wrote the demand note and the exemplars.

Goist was also convicted of a second unarmed bank robbery which occurred on November 17, 2000 at the Farmer's National Bank in Damascus. Ohio. On that date, a man came up to teller Abbey Chappel and handed her a note which read, "Place wrapped hundreds on counter." After Chappel gave the man two or three hundred dollar bills, he then told her to hand him $50s and $20s. Ultimately, Chappel gave the perpetrator $1,750.00. Chappel, who admitted she was physically shaking and very frightened, described the robber as a white male, age thirty to forty, height 5'7" to 5'9" and about 160 to 180 pounds. She also described him as wearing jeans, an orange stocking cap, sunglasses and a plaid shirt.

Two other individuals were at the same bank and observed the robber. Matthew Close, the branch manager, saw a man driving a white car behind the bank. He also saw the same man come into the bank and walk up to a teller window. Close described the man as wearing an orange stocking cap, black sunglasses, white ten-

nis shoes, a green and gray flannel shirt and work pants.

Ryan O'Prondi was a customer at the bank at the time of the robbery. After realizing that the bank had been robbed, O'Prondi ran out of the bank and saw the robber get into a white Lincoln Town Car with temporary license tags. O'Prondi could not otherwise describe the perpetrator.

James Cornell, a former police officer employed as an investigator for the Ohio Bureau of Workers' Compensation, was driving along Route 62 photographing a home that he was investigating. Cornell observed a man run from the bank onto the road directly in front of his car. Cornell was forced to hit his brakes in order to avoid hitting the individual. Cornell testified that he had "direct face-to-face contact with the man." Cornell also testified that he was within five feet of the robber. (J.A. at 92–94.)

Cornell was suspicious of the man's behavior. Consequently, Cornell parked his car and watched the man get into a Lincoln Continental automobile. Cornell then followed the car and took a picture of the vehicle. He then called 911 to inquire as to any unusual circumstances involving the bank. The photographs taken by Cornell included the license plate on the vehicle. Cornell then drove back to the bank where he gave the information to the police and an FBI agent. He also was able to give the police a digital picture of the getaway car together with the number and letters on the temporary tag. Thereafter, police in Alliance. Ohio were able to stop the white Lincoln automobile displaying the same temporary tags identified in the photograph taken by Cornell.

At the time the vehicle was stopped, Cornell was still being interviewed by an FBI agent at the bank in Damascus. In the course of searching the vehicle. FBI agents recovered documentation that the vehicle was registered in the Appellant's name. In the rear of the vehicle were sunglasses. The FBI also recovered a torn piece of memo paper. A document examiner from the FBI later testified that the torn piece of memo paper taken from the Lincoln and a demand note given to the teller in the November 17th robbery had both come from the same piece of paper. A green and gray flannel jacket was also found in a paper bag recovered from Goist's residence. Goist himself was found to be in possession of twenty-four $20 bills.

FBI agents in separate cars transported Chappel and Cornell to the stop site to determine if either of them could identify Goist as the bank robbery suspect. Approximately two hours after the robbery, both Chappel and Cornell were driven to the show-up site where Goist was handcuffed and in the presence of at least five police officers, several of whom were attired in uniform. As Chappel was first driven past Goist, she was unsure if he was the person who had robbed the bank. After being driven by him a second time. Chappel claimed that from Goist's side profile she knew him to be the bank robber. According to Chappel, the agents told her to look at the man to see if she could identify him as the robber, but also told her that the person might not be the same individual who had been at the bank earlier in the day. Chappel later testified that she was one-hundred percent positive of the identification.

An FBI agent also drove Cornell to the location where Goist had been stopped and arrested. Cornell testified that he was absolutely certain that Goist was the person he had seen running from the bank and directly in front of his automobile. Cornell also claimed that he was one-hundred percent positive that Goist was the man in question. He was also able to

identify the vehicle as the same one he had followed earlier in the day. Both Chappel and Cornell noticed that Goist's hands were behind his back. No testimony was elicited by either side to indicate that either Chappel or Cornell knew that Goist was handcuffed.

Thereafter, Goist was taken to the Alliance Police Department. He was advised of his *Miranda* rights and agreed to make a statement. Subsequently, he stated to an FBI agent that he wished to speak to a lawyer. The agents thereupon terminated the interview. One of the FBI agents then left the room. The remaining agent testified that he did not ask Goist any additional questions. He did testify that he and Goist exchanged comments, which he could not remember. While waiting to be moved into a different cell, Goist, according to the agent, blurted out "I did it." The agent also testified that he thereupon told Goist not to say anything else. (J.A. at 208–09, 217.)

## II.

With regard to Goist's challenge as to the admissibility of show-up testimony and in-court identification, the district court's factual determinations are reviewed for clear error. *United States v. Hamilton,* 684 F.2d 380, 383 (6th Cir.1982). The ultimate legal question as to the reliability of the identification testimony is subject to *de novo* review. *Smith v. Perini,* 723 F.2d 478, 481 (6th Cir.1983).

With regard to the admissibility of Goist's self incriminating statement, this Court reviews factual findings concerning a confession for clear error, while reviewing the ultimate question of voluntariness *de novo. United States v. Marks,* 209 F.3d 577, 581 (6th Cir.2000).

## III.

### A. Show-up Testimony and In–Court Identification

Initially, the district court applied the correct legal analysis regarding the Appellant–Defendant's challenge to the admissibility of the show-up evidence. As first explained by the Supreme Court in *Stovall v. Denno,* 388 U.S. 293, 302, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967), a defendant is deprived of the constitutional right to confrontation if the method of identification of the accused was "so unnecessarily suggestive and conducive to irreparable mistaken identification...." In *Neil v. Biggers,* 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972), the Court held:

> Some general guidelines emerge from these cases as to the relationship between suggestiveness and misidentification. It is, first of all, apparent that the primary evil to be avoided is "a very substantial likelihood of irreparable misidentification...." While the phrase was coined as a standard for determining whether an in-court identification would be admissible in the wake of a suggestive out-of-court identification, with the deletion of "irreparable" it serves equally well as a standard for the admissibility of testimony concerning the out-of-court identification itself. It is the likelihood of misidentification which violates a defendant's right to due process, and it is this which was the basis of the exclusion of evidence in Foster. Suggestive confrontations are disapproved because they increase the likelihood of misidentification, and unnecessarily suggestive ones are condemned for the further reason that the increased chance of misidentification is gratuitous.

*Id.* at 198 (citations and footnote omitted).

This Court has adopted a procedure described in *Ledbetter v. Edwards,* 35 F.3d 1062 (6th Cir.1994), as follows:

In assessing the validity of a pretrial identification, this court follows a two-step analysis. The court first considers whether the procedure was unduly suggestive.... The defendant bears the burden of proving this element.... If the court does find that the procedure was unduly suggestive, it next evaluates the totality of the circumstances to determine whether the identification was nevertheless reliable.... Five factors that are considered in assessing the reliability of the identification include: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness's degree of attention at the time of observation; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated by the witness when confronting the defendant; and (5) the length of time between the crime and the confrontation.

*Id.* at 1070–71 (citations omitted).

■ With regard to both Cornell and Chappel, the district court first concluded that the procedures used resulting in a show-up identification were inherently suggestive. The district court noted that the circumstances involved "one individual on the side of the road with his hands behind his back, and it is clear that the witness believed there was only one individual she was to look at." (J.A. at 166.) The government does not challenge the district court's conclusion on this point and the record justifies this portion of the decision.

The district court thereafter articulated and applied the analysis set forth in *Ledbetter v. Edwards,* 35 F.3d at 1070–71. With regard to Chappel, the court found that her identification of the defendant was otherwise admissible "because of the strength of the witness's testimony." (J.A. at 167.) The district court concluded that Chappel had a substantial opportunity to view Goist. Chappel and Goist exchanged words and she observed him in a face-to-face confrontation. The description given by Chappel was somewhat general, but otherwise accurate. The district court noted that the witness was one-hundred percent certain of her identification of Goist. Finally, the court noted that the time between the bank robbery and the show-up identification was between an hour-and-a-half and two hours. (J.A. at 167.) The court concluded that the testimony was admissible, notwithstanding the suggestive show-up procedures. The district court noted that counsel for Goist was free to attack the strength of the identification and the methods used in the show-up as cross-examination fodder. (J.A. at 168.)

With regard to Cornell, the court again concluded that the show-up methodology was impermissibly suggestive. For different reasons than those given with regard to Chappel, the court nonetheless admitted the testimony of Cornell regarding both the show-up identification as well as in-court identification of Goist. (J.A. at 200–01, 203.)

In applying the same analysis described in *Ledbetter v. Edwards,* the court first noted that the show-up procedure was slightly less suggestive than that used with regard to Chappel. As to Cornell, the district court emphasized that the primary purpose for which he was asked to give show-up identification was with regard to the automobile. (J.A. at 201.) The district court concluded that the witness had "a brief but direct opportunity to view the perpetrator." (J.A. at 201.) She also credited Cornell's conclusion that because his vehicle almost struck Goist he had a vivid recollection of the identity of the individual. The district court noted that Cornell was a trained law enforcement officer working as an investigator and con-

cluded that he had a higher sense of detail than a lay individual. (J.A. at 202.)

The court also considered whether Cornell's prior description of the perpetrator corroborated his eyewitness identification. The prior description was not as accurate as that given by other witnesses, although the court found that it was generally descriptive of the Defendant. Cornell testified that he was one-hundred percent certain that Goist was the individual who ran in front of this car in the vicinity of the bank and the same person who drove off in the white Lincoln. Again, the court noted that the length of time that Cornell first witnessed the perpetrator and the time of the show-up identification was of short duration. She again concluded that the jury would have the opportunity then to weigh the credibility of both the show-up and in-court identification made by Cornell of Goist. (J.A. at 202–03.)

This Court has recently noted the unreliability of eyewitness testimony which may oftentimes be given great weight by juries. *United States v. Smithers*, 212 F.3d 306, 311–12 (6th Cir.2000). While this case does involve other inculpating evidence beyond eyewitness identification, the potential for an unreliable eyewitness identification is greatly increased by an impermissibly suggestive show-up procedure. Nonetheless, the district court's factual determinations are not clearly erroneous. Both witnesses viewed the defendant at a very short distance. The bank teller was only a few feet from the robber and exchanged words with him. Cornell was only five feet from the person running out of the bank into the white Lincoln. Both had the opportunity to observe the physical appearance of the perpetrator.

Further, both witnesses were involved in circumstances which presumably demanded their full attention. The bank teller was approached by a bank robber, while the claims investigator almost ran over the person who was running across the street. Neither of the observations was made casually without appreciation of highly unusual circumstances. The prior descriptions given by both witnesses were somewhat general, but not erroneous. Both witnesses were certain of their identification of Goist. Finally, the time between the crime and the confrontation was two hours or less. The record supports the factual determinations made by the district judge.

As noted in *Smith v. Perini*, " '[a] defendant is denied due process only when the identification evidence is so unreliable that its introduction renders a trial unfair. As long as there is not a substantial likelihood of misidentification, it is the function of the jury to determine the ultimate weight to be given to the identification.' " 723 F.2d 478, 482 (6th Cir.1983) (quoting *Summitt v. Bordenkircher*, 608 F.2d 247, 253 (6th Cir.1979)). The record does not disclose a substantial likelihood of misidentification. The district court correctly analyzed and admitted the identification testimony.

## B. Goist's Statement

■ With regard to Goist's claim that he was interrogated, either directly or indirectly, after asking for a lawyer, Special Agent Johnson testified that he was alone with Goist after a request for counsel was made. He denied asking Goist any questions. Without prompting or questioning by the agent, Agent Johnson testified that Goist told him "I did it." (J.A. at 215.) On cross examination, Agent Johnson estimated he was alone in the room with Goist for five minutes. (J.A. at 216.) His testimony was as follows: "I won't say any words were not exchanged, but they had nothing to do with the matter we were there on." (J.A. at 216.) He described any conversation thereafter as small talk. The agent also testified that he specifically

advised Goist not to make any other statements regarding the bank robbery during the same time period. (J.A. at 217.)

In *Rhode Island v. Innis,* 446 U.S. 291, 300–01, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980), the Supreme Court viewed an interrogation, for purposes of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), to include other techniques of persuasion, beyond formal asking of questions. The Court described interrogation to include "either express questioning or its functional equivalent ... [including] any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Innis,* 446 U.S. at 300–01.

The record does not support Goist's contention that the actions of the agent constituted actual questioning or more subtle forms of interrogation. The agent testified that any conversation which occurred between himself and Goist involved small talk. The agent also testified that he advised Goist to make no more statements concerning the bank robberies. There is no testimony or other evidence of record to the contrary. The district court correctly admitted Goist's inculpatory statement.

### IV.

Based upon the foregoing, the decision of the district court is **AFFIRMED** in all respects.