NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 04a0005n.06
Filed: October 5, 2004

NCase o. 03-4019

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| JAMES B. CARVER, | ) | |
| | ) | |
| Petitioner – Appellant | ) | |
| | ) | |
| v. | ) | **ON APPEAL** FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| ROBERT MACK, et al. | ) | NORTHERN DISTRICT OF OHIO AT |
| | ) | CLEVELAND |
| Respondents – Appellees | ) | |
| | ) | |
| | ) | |

**BEFORE:** **MERRITT, MOORE and GILMAN, Circuit Judges.**

**MERRITT, Circuit Judge.** Plaintiff James Carver appeals the district court's ruling granting defendants' motion for summary judgment in this case brought under 42 U.S.C. § 1983 for false arrest. He claims that there was no probable cause for his arrest. For the reasons stated below, we AFFIRM.

## STANDARD OF REVIEW

As the Court stated recently,

The district court's decision granting summary judgment is reviewed de novo. Summary judgment is appropriate when there are no genuine issues of material fact in dispute and the moving party is entitled to judgment as a matter of law. In deciding a motion for summary judgment, the court must view the evidence and reasonable inferences in the light most favorable to the nonmoving party. The nonmoving party may not rest on his pleadings, but must come forward with evidence from which a rational trier of fact could find in his favor.

*Bridgeport Music, Inc. v. Diamond Time, Ltd.*, 371 F.3d 883, 889 (6th Cir. 2004) (internal citations omitted).

We will follow this standard by summarizing the facts and reviewing the ruling below.

## SUMMARY OF FACTS

In the early morning hours of January 25, 1998, two men forced their way into the trailer home of Barry Bowman, held him at gun point, stole his wallet from his bedroom and fled the home. The man wielding the gun wore a ski-mask.

The same evening, James Carver, the plaintiff in this case, walked past Bowman's trailer through freshly fallen snow on the way to his own trailer, which he shared with his uncle, and which sat in the same trailer park as Bowman's. He arrived home uneventfully, spoke briefly with his uncle and both men retired for the evening.

In response to a call by Bowman about the burglary, Richland County Sheriff's Deputies Shook, Rogers and Cope arrived at Bowman's trailer and investigated the crime. They questioned Bowman and discovered several sets of footprints in the area. Following Carver's prints they arrived at his trailer and knocked on the door until Carver's uncle responded. They questioned the men about the robbery and received permission to search the trailer, which they did, taking Carver's wet boots and jacket. Both men denied any knowledge of the robbery. The deputies asked Carver if he had a gun. He responded that he did and turned it over to police. This was a .357 magnum revolver with a brown stock. Mr. Bowman described the gun used in the robbery as a small, short barreled revolver, that was a dark color, possibly black or gray. Later evidence showed the "gun" that was actually used in the robbery was a toy cap gun.

Both Carver and his uncle report in their affidavits that the deputies then arrested Carver, telling him he was being arrested for "aggravated burglary." J.A. at 176 & 183. This is inconsistent

with the depositions of the deputies. The depositions state that while Shook was questioning Carver inside the trailer, Rogers took identification provided by Carver, went outside and used the radio to check for outstanding warrants. J.A. at 69 & 73. He was informed that Carver did have an outstanding warrant for his arrest. The deputies reported that it was this warrant, not the burglary, that provided the basis for Carver's arrest that night. Carver does not directly dispute the testimony that the deputies checked for warrants before arresting him. He simply provides his own eyewitness testimony and that of his uncle that the deputies told him he was being arrested for the burglary. He does, however, admit to providing identification to the deputies prior to his arrest. J.A. at 176. Carver alleges that he did not learn of the warrant's existence until the next day.

A short time after arresting Carver, the deputies took him to Bowman's residence for possible identification as one of the burglars. Carver reported that after he was presented to Bowman, he heard one of the deputies state that Carver was "not the guy." J.A. at 177.

Carver was held in jail for the rest of the night and questioned the next morning by Detective Mack, a defendant in this case, regarding the robbery. Carver maintained his innocence, but was ultimately held in jail for three more days until he paid the fines for the outstanding warrant for failure to appear in court on a charge of driving without a license. He was released, but his boots, jacket and gun were kept by law enforcement as evidence in the burglary case.

The investigation remained open for many months. Detective Mack's casenotes identify Carver as his "key suspect" during this time frame, in spite of all forensic tests on the evidence "com[ing] back negative." J.A. at 186. Mack has admitted that on August 8, 1998, he intentionally misled Carver into coming in to the Sheriff's Office by telling him that if he did so he would receive his gun. Mack never intended to return the weapon. When Carver appeared, Mack questioned him

briefly and then asked him to submit to a Voice Stress Analyzer,[1] again promising the return of his property if he complied. Carver agreed to participate in the test and signed a pre-printed, written waiver. J.A. at 245 & J.A. Supp. at 336-38. The test was conducted by Sgt. McBride, a co-defendant in this case. Mack noted that Carver displayed significant anxiety and stress just prior to starting the test. Afterwards, McBride reported to Mack that Carver had failed the test and he believed Carver was involved in the robbery. Since Mack concluded that he still lacked sufficient evidence to arrest Carver, Carver was allowed to leave.

In September 1998, Mack received information from a confidential informant that the Bowman robbery had been committed by two individuals who had not previously been suspects, Weston Cordle and Ronnie Bays. These men were arrested and both confessed to the crime and implicated the other. However, the informant stated that a third person, whose name he did not know, was also involved as a driver. Carver's Brief implies that the informant *only* mentioned Cordle and Bays, but this is not supported by the evidence. Carver Br. at 8; J.A. at 191 & J.A. Supp. at 291. Involvement of a third person was also confirmed by Bays, who reported in his confession that a friend of Cordle's had provided them transportation to and from Bowman's house, dropping them at Cordle's home after the crime. He did not know the man's name. Bays later positively identified Carver as the driver when Mack showed him a picture of Carver. J.A. at 94-95. Carver's Brief states that Bays never positively identified Carver as the driver, but offers no evidence in support of this position. Carver Br. at 9; J.A. at 94.

Cordle denied involvement of a third person, claiming that Bays drove them to the trailer park. Cordle went so far as to state that he did not know James Carver at all. In spite of this, Mack

---

[1]This appears to be some sort of lie detection device that purports to measure a subject's voice patterns while he answers yes/no questions posed by the test administrator.

reported in his deposition that he continued to view Carver as a suspect because of the other evidence pointing to a third man's involvement. J.A. at 313.

Mack presented the available evidence against Carver to the Richland County Prosecutor's Office. Prosecutor Mayer then presented it to the grand jury in January 1999, with Mack apparently serving as a testifying witness. There are some inconsistencies between the "Prosecutor Intake Form," which apparently reflects the prosecutor's understanding of what Mack told him, and other evidence. J.A. at 242. The Intake Form's troubling assertions include: (1) that "D" (the signification for James Carver) cut the phone line during the burglary (there is no evidence for this; in fact Bays stated that Cordle cut the phone line); (2) that the confidential informant told Mack that D committed the crime with Bays (the informant never named Carver specifically, he only reported the involvement of an unknown third man); and (3) that Bays stated that D was a friend of Cordle (Cordle denied knowing Carver). It is possible that the informant's vague statements that a friend of Cordle's was involved as a driver were documented by the prosecutor as inculpatory allegations against Carver. From these inconsistencies, Carver draws the conclusion that Mack presented false testimony to the grand jury, but there is no direct evidence to support this conclusion. The grand jury handed down an indictment against Carver for Aggravated Burglary on January 27, 1999. He was arrested, served some time on another unrelated, outstanding warrant (Carver implies this incarceration was due to the Aggravated Burglary charges but offers no evidence in support) and was then released and placed on house arrest while awaiting trial for the burglary.

On August 23, 1999, Bays contacted Mack. He recanted his position that Carver was the driver. The case was then dismissed with prejudice. J.A. at 94-95. Even so, Mack has maintained an open investigation in this matter, with Carver as a suspect. J.A. at 317. Subsequent to the dismissal of the burglary charges, Carver filed § 1983 and related state-law claims in federal district

court against Mack, McBride, Sheriff Stierhoff, Mayer, and Richland County. He failed to name as defendants any of the deputies who originally arrested him. Although his initial complaint listed five to-be-identified defendants, we cannot find any record that he later named the deputies (or any other parties) as the John Does. The parties completed significant discovery before the court granted defendants' motion for summary judgment as to the § 1983 claims and dismissed the state-law claims without prejudice. Carver has appealed with respect to his § 1983 claims only.

## DISCUSSION

### A. Deputies Had Probable Cause to Arrest Carver for the Bowman Burglary

Assuming the truth of Carver's claim that the real reason for his arrest on January 25 was the burglary of Bowman's trailer, we conclude that the undisputed pieces of evidence possessed by the arresting deputies were adequate to support probable cause. To find probable cause,

> [o]fficers [must] be able to articulate concrete facts from which they infer a probability that illegality has occurred. As we have consistently emphasized, however, while officers must show more than mere suspicion, the probable cause requirement does not require that they possess evidence sufficient to establish a prima facie case at trial, much less evidence sufficient to establish guilt beyond a reasonable doubt.

*United States v. Strickland*, 144 F.3d 412, 415-16 (6th Cir. 1998).

It is appropriate to decide the question of probable cause at the summary judgment stage if, when viewing all evidence in the light most favorable to the non-moving party, there is only one possible outcome. *Klein v. Long*, 275 F3d. 544, 550 (6th Cir. 2001). Here, there were two pieces of undisputed evidence available to the police at the time of Carver's arrest that provide probable cause: (1) a trail of Carver's fresh footprints went from the victim's home to Carver's residence, and (2) Carver possessed a gun that matched the victim's general description of the weapon used in the burglary. Although Carver's Brief claims that his gun bore no resemblance to the handgun described

by Bowman, that is not a reasonable conclusion to draw from Bowman's statement and the physical appearance of a .357 magnum.

## B. Claims Regarding Subsequent Investigatory and Prosecutorial Actions Are Without Merit

### 1. Detective's Dishonesty & Use of Voice Stress Test Were Not Constitutional Violations

Carver claims that Detective Mack's later investigative techniques provide the basis for a § 1983 claim. Mack has admitted that he intentionally lied to Carver to induce him to come in for questioning. Mack then leveraged Carver's appearance into a brief interrogation session followed by the administration of a Voice Stress Analyzer test by Sgt. McBride. Carver signed a detailed waiver regarding the test, indicating that he knew it was voluntary and that he was free to leave if he chose. Carver, who had been released and was not under arrest, has not claimed that he was arrested at this time or that the questions constituted a custodial interrogation in violation of his right to counsel or right against self-incrimination. Assuming his position is that he felt coerced into cooperation based on Mack's misrepresentation about the return of his property, this Court has upheld far more elaborate trickery by police than what was present here. *See Ledbetter v. Edwards*, 35 F.3d 1062, 1066 (6th Cir. 1994) (finding no constitutional violation when police dishonestly claimed to have suspect's fingerprints from the crime scene, told suspect that the victim and other witnesses had identified him when they had not, and set up a female officer in front of a two-way mirror to show the supposed silhouette of the victim, ready to confront him). Police deception of this type is not unconstitutional according to our binding decision in *Ledbetter*.

### 2. Carver's Allegation that Mack Presented Perjured Testimony to the Grand Jury Has No Evidentiary Support

Carver claims that Mack lied to the grand jury and failed to provide it with exculpatory evidence that he had available at the time, thereby obtaining an indictment and subsequent arrest that were constitutionally offensive because they were not supported by probable cause.

There is no evidence whatsoever that Mack lied or presented perjured testimony to the grand jury. At most, there is evidence that he presented inaccurate information to the prosecutor, but that does not necessarily translate into dishonest testimony to the grand jury. Grand jury testimony is secret, *see* OHIO REV. CODE ANN. § 2939.11 (2004), and Detective Mack followed his counsel's instructions not to answer questions during his deposition regarding his testimony before the grand jury. Carver therefore relies on two theories to attack the indictment.

First, he argues that the Prosecutor's Intake Form contains assertions that inaccurately implicate Carver in the burglary, J.A. at 242, but there is no evidence to support the conclusion that the information in the form was actually presented to the grand jury. Second, he points out that Mack possessed exculpatory evidence that he did not present to the grand jury. As discussed above, we do not know precisely what was presented to the grand jury, but assuming Carver's assertions are true, the Supreme Court in *Williams* announced there is no federal duty to present exculpatory evidence to a grand jury. *See United States v. Williams*, 504 U.S. 36, 47 (1992); *see also United States v. Angel,* 355 F.3d 462 (6th Cir. 2004) (discussing *Williams* holding).

3. Prosecutor Mayer's Choice Not To Dismiss Charges After Receiving Evidence Favorable to Carver Is Not a Constitutional Violation

Carver further complains that after he was indicted, prosecutor Mayer failed to drop the indictment against him when he received exculpatory evidence from Detective Mack. In April 1999, three months after the grand jury handed down its indictment, Mack reported to prosecutor Mayer that Cordle had stated Carver was not involved in the burglary. In spite of this evidence, charges

were not dropped until August 1999, when Bays recanted his positive identification of Carver as the driver on the night of the crime. It appears that the prosecutor's office considered Bays' testimony as strong enough to support the charges against Carver, even in light of Cordle's statements.

We find no principle or precedent, nor has Carver offered any, to support the proposition that an individual's constitutional rights are violated when a prosecutor fails to drop charges immediately that were properly handed down by a grand jury, simply because new evidence comes to light that casts some doubt on the guilt of the accused.

Moreover, Mayer would be entitled to absolute prosecutorial immunity under *Imbler v. Pachtman*, 424 U.S. 409 (1976) (establishing absolute immunity against § 1983 claims for prosecutors acting in their advocacy role on behalf of the state).

4. Carver's Constitutional Rights Were Not Violated When Mack Continued to View Him as a Suspect in the Burglary

Finally, Carver accurately states that Mack has continued, at least as of the time of his deposition in November 2001, to view Carver as a suspect in the burglary and to maintain an open investigation of Carver's involvement in spite of all charges being dropped in August 1999. J.A. at 317. However, Carver presents no cognizable claim of actual injury, or constitutional tort arising from this fact.

5. Carver Has Failed to Offer Any Evidence Against Sheriff Stierhoff as an Individual

Carver has offered no evidence against Sheriff Stierhoff in his individual capacity. The Sheriff similarly denies any personal involvement in Carver's case. The district court was therefore correct to grant summary judgment in favor of the Sheriff.

**C. Municipal Liability**

For Richland County to be liable under § 1983, Carver must demonstrate a violation of his constitutional rights due to some "policy or custom" of the County. *Monell v. New York City Dept. of Social Services,* 436 U.S. 658 (1978). Carver has failed to identify any cognizable constitutional violation by any defendant in this case, so there is no need to engage in a detailed municipal liability analysis.

## CONCLUSION

For the reasons detailed above, the district court's ruling granting summary judgment in favor of defendants is AFFIRMED.