**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Stanson HEMPHILL, Defendant–**
**Appellant.**

No. 02–3130.

United States Court of Appeals,
Sixth Circuit.

Aug. 6, 2003.

8

Before BOGGS and GILMAN, Circuit Judges, and DOWD, Senior District Judge.*

OPINION

DOWD, Judge.

Defendant-appellant Stanson Hemphill (Hemphill) challenges his convictions and sentences on charges of bank robbery, conspiracy to commit bank robbery, and use of a firearm in relation to a crime of violence. After a thorough review of the trial transcript in light of the claimed errors, we affirm.

* The Honorable David D. Dowd, Jr., Senior United States District Judge for the Northern

I.

Hemphill was one of three defendants named in a three-count indictment. He was charged as follows: Count One—conspiracy to commit bank robbery; Count Two—bank robbery of the First National Bank of Southwestern Ohio located in Hamilton, Ohio (Butler County) on May 9, 2002; and Count Three—knowing use of a firearm during and in relation to a crime of violence in violation of 18 U.S.C. § 924(c)(1)(A)(ii). As to Counts Two and Three, Hemphill was also charged as an aider and abettor.

Hemphill entered a plea of not guilty to the three counts of the indictment and was subsequently tried and convicted on all three counts. On January 29, 2002, he was sentenced to concurrent terms of 60 months on the conspiracy count and 87 months on the substantive crime of bank robbery. He also received a sentence of 84 months on the § 924 conviction, to be served consecutive to the other sentences, for a total sentence of 171 months.

Hemphill's co-defendants Richard Depew (Depew) and Douglas E. Brown (Brown) testified for the government, as did an alleged unindicted co-conspirator, Jessica Witt (Witt). Collectively, their testimony identified Hemphill as the planner of the bank robbery that had been carried out by Depew and Brown with the assistance of Witt, the bank teller who gathered the currency under an apparent threat from Depew who displayed a handgun during the robbery. The cooperating defendants and Witt explained how Hemphill planned the robbery, provided Depew with the mask and handgun, and drove the getaway car. Hemphill's defense was lim-

District of Ohio, sitting by designation.

ited to two witnesses who attempted to account for Hemphill's whereabouts on the day of the robbery.

## II.

Hemphill claims there were four errors committed during his trial which require reversal: (1) the government's introduction of highly prejudicial bad acts testimony coupled with failure to give a contemporaneous limiting instruction; (2) the government's misstatement of the law during closing argument; (3) the constructive amendment of the indictment; and (4) the insufficiency of the evidence to support the three convictions. We will address each claimed error separately.

## A.

 Hemphill characterizes his first claim of error as one involving prejudicial "other acts" evidence under Fed.R.Evid. 404(b).[1] As our lengthy discussion below will show, that is an oversimplification. A careful review of the trial transcript reveals that, in the process of presenting *relevant* testimony under Fed.R.Evid. 402, two of the government's witnesses inserted mostly unsolicited and/or gratuitous comments. The trial court was dealing with relevant testimony *mixed with* improper testimony and the question is, therefore, more accurately framed as whether admissibility of such mixed evidence, without a *sua sponte* limiting instruction, is plain

error requiring a new trial, or is harmless error.

At trial, Hemphill's position was that the handgun brandished by Richard Depew during the bank robbery belonged to Bobbi Jo Depew. Therefore, the government had to present evidence to connect Hemphill to that gun.[2] First, Bobbi Jo Depew, sister of Richard Depew, testified that she purchased the handgun at a pawn shop, in the presence of Hemphill and at his direction. Richard Depew, who brandished the handgun during the robbery, testified that Hemphill provided the handgun.

In addition to that testimony, the government used ballistics testimony to connect Hemphill to a January 22, 2001 use of the handgun. Specifically, testimony was offered by Hamilton. Ohio police officers that a shooting was reported on January 22, 2001. Subsequently, Hemphill appeared to admit firing an unidentified gun. A spent shell casing was located at the scene of the shooting and was retained as evidence. After the bank robbery, that spent shell casing was identified by ballistics experts as having been fired from the handgun brandished in the bank robbery.

In sum, the testimony of Bobbi Jo Depew and Richard Depew, together with the ballistics testimony, was introduced to support the § 924 count in the indictment and the proposition that Hemphill was guilty on that count as an aider and abettor.

The difficulty arising from the ballistics testimony is the gratuitous commentary

---

1. Ordinarily, we would review a district court's determination regarding the admissibility of Rule 404(b) evidence under an abuse of discretion standard. *United States v. Mack*, 258 F.3d 548, 553 (6th Cir.2001) (citing *Trepel v. Roadway Express, Inc.*, 194 F.3d 708, 716 (6th Cir.1999) which explained that per the Supreme Court's decision in *General Electric Co. v. Joiner*, 522 U.S. 136, 142–43, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997), all evidentiary

rulings are to be reviewed under an abuse of discretion standard).

2. Count Three in the indictment charged Hemphill and Richard W. Depew with violation of 18 U.S.C. §§ 924(c)(1)(A)(ii) and 2. The firearm that was alleged to have been brandished during the bank robbery was described as a Ruger, Model P9, Stainless .45–caliber semi-automatic pistol, serial number 58105977.

that Hamilton Police Officers Ungerbuehler and Hensley made while giving relevant testimony tying Hemphill to the firing of a weapon.

Hemphill's counsel made a timely objection prior to the introduction of the officers' testimony and the following colloquy took place after the government began questioning Officer Ungerbuehler to establish the discovery of the spent shell casing following the shooting on January 22, 2001:

Q. I want to direct your attention back to January 22nd, 2001. Were you working that day?

A. Yes, I was.

Q. On that date did you have occasion to respond to a scene regarding a shot being fired?

A. Yes, I did.

MR. SNYDER: Your Honor. I have an objection. May we be heard?

THE COURT: Yes.

SIDEBAR CONFERENCE

MR. SNYDER: Your Honor, for purposes of making a record. I'm going to renew my objection that I cited in my motion in limine as to any testimony about the Butler County incident that we're going to hear from a few witnesses today, and again this is for purposes of making a record.

MR. SPRINGER [AUSA]: Opposing counsel has challenged the authenticity of the gun in question here. Testimony already elicited in this trial has indicated that this particular gun was registered in the name of Bobbi Jo Depew. Testimony through one of the witnesses suggested that the Defendant was present when the gun was purchased, that the gun was purchased with the Defendant's money, that the Defendant took possession of the gun immediately after its purchase.

This testimony that we're getting ready to elicit from this particular witness will do two things. First of all, it will corroborate Bobbi Depew's testimony, and, second place, the gun in the— place the Defendant with access of the gun, thereby giving him the opportunity to provide it during the conspiracy we have charged in the indictment.

THE COURT: What do you anticipate this witness would testify to?

MR. SPRINGER: This witness will testify he recovered a shell casing at the scene of this crime he responded to. That shell casing, through later witnesses, will be shown to have been fired from the gun that's in question.

THE COURT: Okay.

MR. SNYDER: From the gun?

MR. SPRINGER: From Exhibit No. 2.

MR. SNYDER: From Exhibit No. 2?

MR. SPRINGER: From Exhibit No. 2, yes.

MR. KOHNEN [AUSA]: I might also add. Your Honor, the Defendant admitted to having fired the gun on the date in question to another Police Officer who will testify.

THE COURT: I'm still not seeing a connection with the Defendant. This officer responded to a crime scene, found a shell on the ground; it had been fired from this gun.

MR. SPRINGER: We'll have another witness that will have spoken and arrested the Defendant as a result of this incident, and that Defendant, after being arrested, admitted to that witness that he in fact had fired a gun at that location that night.

THE COURT: Well—

MR. SNYDER: Judge, I have a problem with that without that foundation first. I understand the Court's position as to the motion in limine, but

we're also talking about a gun which has that serial number on it different from the one that's in the indictment, and I know that's an issue that we'll have to take up at some later point with the Court based on the testimony we've heard this morning. But, I'm not seeing that—the connection here as to the Defendant with just this witness right here.

THE COURT: *Okay. So, what you're telling me, this fellow is foundational to the next witness who will put Mr. Hemphill in connection with this firearm.*

MR. SPRINGER: Yes.

THE COURT: Okay. But we're not going to do details of the nature of the other crime or whether Mr. Hemphill was charged—

MR. SPRINGER: No.

THE COURT:—convicted or anything like that?

MR. SPRINGER: No. we're not. No. Your Honor.

THE COURT: Well, I'll overrule the objection.

MR. SNYDER: With that proviso?

THE COURT: Yes.

MR. SNYDER: Thank you, Your Honor.

R. 84 at 239–42 (emphasis added).

The questioning of Officer Ungerbuehler then continued as follows:

Q. Directing your attention, Officer Ungerbuehler, to back to January 22nd, 2001, moments ago I was asking you whether you had an occasion to respond to an incident regarding a shot being fired.

A. Yes, I did.

Q. And where did that shot—where did that place?

A. We received a call to 518 South Monument Street.

Q. Did you respond to 518 South Monument Street?

A. Yes. I did.

Q. When you arrived at that scene, what were the steps you took?

A. When I arrived, I also arrived with Officer Topic and I believe two other officers. *We all surrounded the building because we didn't know if the suspect was still inside.* One officer went—or actually two officers went to the front doors to the apartment complex. One officer went to the one corner, one officer went to the other corner. Myself and another officer went inside. As we were walking inside, there was a shell casing from a firearm in the hallway. So, we proceeded to check the building, which rooms were open, what rooms were not open. *At that time, came to the conclusion that there was no one else in the building, that the suspect already left.* We went inside the apartment and they had gone out one of the bedroom windows in the apartment.

Q. When you observed this shell casing on the ground, were you with the one that observed that shell casing?

A. Yes.

Q. After you observed that shell casing, what did you do?

A. Initially, we left it on the floor where it was laying until we could secure the building. After that I came back. I believe we tagged the shell casing, which details putting it in a plastic bag, sealing it with evidence tape, initialing it, dating it from the incident, putting the incident number on it, and returning

that property over to the evidence room at police headquarters.

R.84 at 242–43 (emphases added).

The government then introduced the following testimony of Detective William Hensley for the purpose of connecting Hemphill to the firing of a gun during the shooting of January 22, 2001:

Q. I want to direct your attention back to January 22nd, 2001. *Did you receive a call regarding a burglary?*

A. Yes, sir.

Q. How did you receive that call?

A. I was in my office and I had my—our radio on. I just happened to hear—actually a shooting call went on first.

Q. Okay.

A. And officers responded to the scene, which was 518 Monument Street. At that time, I received a call from the Communications Center that they needed a detective. I collected my equipment and went to that address.

Q. Did you respond to that scene?

A. Yes, sir.

Q. Did you conduct your investigation?

A. Yes, sir.

Q. During the course of your investigation, did you have an opportunity to speak to an individual you now know to be Stanson Hemphill?

A. Yes, sir.

Q. How did you come across that?

A. I responded to that scene and I began speaking to witnesses who were there and they provided me with Stanson Hemphill's name.

Q. Did you have an opportunity to speak with Stanson that night?

A. It was that night, early the next morning. It may have been after 12 o'clock. But, yes, later that night or early in the morning, yes, sir.

Q. When did you see him?

A. I'd have to check the case file, but it was somewhere around 12 o'clock, 12:30 a.m., p.m.—or a.m. On the morning—the morning of the 22nd, morning of the 23rd—evening of the 22nd, morning of the 23rd.

Q. What happened when you saw Stanson that night or early morning?

A. He was the individual I was looking for. I responded to his residence, which I knew to be on Petty Drive. Myself and a patrol officers—patrol officer—sat at that residence for a while. I then drove to an address off of Wilson Street in our Second Ward area where Mr. Hemphill's brother lives, and I saw Mr. Hemphill exit the residence and that's when we approached him.

Q. When you approached Mr. Hemphill, what did you say?

A. *Well, when he first saw us, he ran, and we got him cornered in between the alley and the street, and I found him sitting on the porch of a residence a couple houses down from his brother's house.*

Q. What happened next?

A. *I knew Stanson Hemphill* and I told him—I said I needed to speak with him. I asked him to come back to my office with me.

Q. *How did you know Stanson? You said you knew him. How did you know him?*

A. *I had had another case involving Mr. Hemphill.*

Q. Okay. When you took him back to the office, did you then have a conversation with Stanson Hemphill?

A. Yes, sir.

Q. What happened in the conversation?

A. I spoke to Mr. Hemphill about the shooting on Monument Street and he stated that -

R. 84 at 265–67 (emphases added).

After renewed objections by Hemphill's attorney, the court immediately attempted to limit the testimony by stating:

THE COURT: *I'm going to overrule the objection at this point, but I do caution the U.S. Attorneys that we don't want any unduly prejudicial information about other crimes to creep into the case.*

R. 84 at 269 (emphasis added).

The questioning of Hensley then continued as follows:

Q. Moments ago, Detective, you had informed the jury that the Defendant Stanson Hemphill had accompanied you back to the police interview room: is that correct?

A. Yes, sir.

Q. You had a conversation with the defendant at that time?

A. Yes, sir.

Q. What did you ask the defendant?

A. I questioned him in reference to the shooting incident which had occurred several hours before at 518 Monument Street.

Q. What did the defendant tell you?

A. He stated that, *"You're not going to believe me, but the gun wasn't even mine."* I said, "Well, I believe that. Whose was it?" He said, "Frenchman Minniefield." I asked him where the gun was at that time and he didn't respond. I then tried to get the whole statement that—we'd been speaking for sometime at that point, and *I attempted to get the statement reduced to a written statement, and he stated he didn't— he would like to talk to me tomorrow after he went to court, the next day after he went to court. And I explained to him that—first he said, "I think I want an attorney." I said. "Are you advising me you don't want to talk to me anymore?" He said. "Well, I want to talk to you tomorrow after I go to court." I explained that I wouldn't be able to talk to him after that, and I said. "So, are you saying you don't want to talk to me anymore and you want an attorney with you?" And he said, "Yes." At that time the interview was stopped.*

Q. *Did he ever tell you what he did with the gun?*

A. *No, he wouldn't respond at all to that.*

R. 84 at 270–71 (emphases added).

The gratuitous commentary about the "burglary," the fact that Hemphill "ran" (inferring an attempt to escape), the fact that Hemphill was previously the subject of an investigation, and the subsequent refusal of Hemphill to submit to additional questioning, comes within the framework of "other acts" which are not admissible for any purpose under the strict teachings of Rule 404(b) rulings. Moreover, the district court did not engage in a Rule 404(b) analysis or provide any limiting jury instructions that are required when Rule 404(b) evidence is received.[3]

---

**3.** In *United States v. Merriweather*, 78 F.3d 1070 (6th Cir.1996), the court explained how Rule 404(b) should ordinarily be applied. First, "upon objection by the defendant, the proponent of the evidence, usually the government, should be required to identify the *spe-* cific purpose or purposes for which the government offers the evidence of 'other crimes, wrongs, or acts.'" *Id.* at 1076 (emphasis in original). Second, "the district court must determine whether the identified purpose ... is 'material'; that is, whether it is 'in issue' in

The difficulty presented to the trial court by this mixture of both relevant evidence connecting the defendant to the handgun and the improper gratuitous commentary is obvious. Here the district court admonished the government to limit the testimony, but the government attorney apparently did not ask for a continuance so the witnesses could be instructed to avoid gratuitous commentary.

So, underlying the issue of a "back door" introduction of Rule 404(b) evidence, without any analysis as to admissibility or a contemporaneous instruction to the jury, is the question of whether introduction of that gratuitous commentary *along with* the relevant evidence requires a new trial or is merely harmless error.

Here, we pause to discuss the defense presented. It was limited to the testimony of LaShandra Cavanaugh[4] and Billy Garrison,[5] friends of Hemphill, who indicated

---

the case." *Id.* at 1076–77. Third, if the court finds the purpose to be material, it "must *then* determine, before admitting the other acts evidence, whether the probative value of the evidence is substantially outweighed by the danger of unfair prejudice under Rule 403." *Id.* at 1077. Finally, "[i]f the evidence satisfies Rule 403, then, after receiving the evidence, the district court must 'clearly, simply, and correctly' instruct the jury as to the *specific* purpose for which they may consider the evidence." *Id.* at 1077 (emphasis in original) (citing *United States v. Johnson*, 27 F.3d 1186, 1193 (6th Cir.1994), *cert. denied*, 513 U.S. 1115, 115 S.Ct. 910, 130 L.Ed.2d 792 (1995)).

We note that, although *Merriweather* also held that our review of the district court's Rule 404(b) rulings is *de novo*, 78 F.3d at 1074, subsequent rulings have established an abuse of discretion standard. *See* n. 1, *supra*.

4. LaShandra Cavanaugh, 19 years of age, testified that she was the fiancee of the defendant, engaged in baby-sitting two children at Hemphill's residence at the time of the bank robbery and that Hemphill was home during the entire day. She identified one of the children as the daughter of Jessica Witt, the unindicted co-conspirator who was the head teller at the bank. Cavanaugh indicated that she remembered the day in question, May 9, as it was the birthday of Billy Garrison who visited the residence during the day. She also stated on cross-examination that Jessica Witt, Douglas Brown, and Richard Depew would be lying if they testified that they saw Hemphill on that date in the context of the bank robbery. *See* R.84 at 338–51.

5. Billy Garrison testified that he was Hemphill's friend, that he had been at Hemphill's residence on the day of the robbery except for a brief period when he went to lunch, and

that Hemphill was always present. *See* R.84 at 355–57. However, on crossexamination, the following colloquy took place as the government attempted to impeach Garrison:

Q. In fact, you told Agent Moran when they picked you up that you knew it was about the bank robbery; right?
A. Yeah.
Q. You knew that they were wanting to know more about Stanson?
A. Uh-huh.
Q. And you began to tell Agent Moran what you knew about what happened May 9th; correct?
A. Yes.
Q. You told them that it was the Defendant that called you at 10 o'clock in the morning?
A. Ah—I don't really remember that.
Q. You remember telling them that the Defendant asked to use your van?
A. Yeah, to run—and I told him no.
Q. You told him no?
A. Then he asked me if I could, take him somewhere.
Q. You said no again?
A. Yeah. And then I asked him what he wanted to do—what he wanted to do, and he wanted to go out and get something to eat.
Q. Do you remember telling—
A. And I also told them that I was—I took him all the time to get something to eat.
Q. Do you remember this conversation: On the way up to the police station, you remember asking Agent Moran, "This is about Stanson; isn't it?" You remember making that statement?
A. Yeah.
Q. You remember telling the officers that it was Rico [Hemphill] who robbed the bank?

that they were at Hemphill's apartment on the day of the bank robbery and that he did not leave the apartment.

We observe that, when Rule 404(b) evidence is "inextricably intertwined" with evidence relevant to the crime charged, the admonitions limiting the admission of 404(b) evidence do not apply. *United States v. Torres*, 685 F.2d 921, 924 (5th Cir.1982) (*per curiam*). Citing *Torres*, this court has held:

> When the other crimes or wrongs occurred at different times and under different circumstances from the offense charged, the deeds are termed "extrinsic." "Intrinsic" acts, on the other hand, are those that are part of a single criminal episode. *Rule 404(b) is not implicated when the other crimes or wrongs evidence is part of a continuing pattern of illegal activity. When that circumstance applies, the government has no duty to disclose the other crimes or wrongs evidence.*
>
> The 1991 Advisory Committee note to Rule 404(b) is in agreement: "The amendment does not extend to evidence of acts which are '*intrinsic*' to the charged offense, *see United States v. Williams*, 900 F.2d 823 (5th Cir. 1990)...." For similar holdings, *see United States v. Dozie*, 27 F.3d 95, 97 (4th Cir.1994) (*per curiam*), *United States v. Nicholson*, 17 F.3d 1294, 1298 (10th Cir.1994), *United States v. Sparks*, 2 F.3d 574, 581 (5th Cir.1993), and *United States v. Lambert*, 995 F.2d 1006, 1007–08 (10th Cir.1993).

*United States v. Barnes*, 49 F.3d 1144, 1149 (6th Cir.1995) (emphasis added).

In our view, the commentary by the Hamilton police officers did not constitute "*intrinsic*" evidence. Connecting Hemphill to the gun used in the bank robbery did not require gratuitous commentary about burglary, the fact that Hemphill ran, the fact that Hemphill was apparently arrested and kept overnight, the fact that Officer Hensley knew Hemphill from before, or that Hemphill failed to give a written statement to Hensley concerning the events that caused the officers to be involved in the January 22, 2001 incident.

We begin by recognizing that the district court committed no error in permitting the government to use ballistics evidence to attempt to link Hemphill to the handgun brandished in the bank robbery, the handgun allegedly furnished by the defendant to Depew. In the context of the ballistics evidence and Hemphill's apparent admission arising from the January 22, 2001 incident, the teachings of *United States v. Price*, 329 F.3d 903 (6th Cir.2003) are relevant. The *Price* court declared that Rule 404(b) applies to evidence submitted to prove an extraneous "other act," but is not applicable to "evidence that itself is probative of the crime charged[.]" *Id.* at 906 (citing *United States v. DeClue*, 899 F.2d 1465, 1472 (6th Cir.1990)). Here, the district court cautioned the government to avoid testimony about other crimes. Despite that admonition, suggestive testimony about the defendant being engaged in other criminal conduct crept into both the questions of the government and the responses of the government witnesses. Ungerbuehler and Hensley. We observe, however, that counsel for the defendant made neither a motion to strike

A. No, I do not. I said, "Is this about the bank robbery that I read in the paper with Rico?"
Q. And when you gave your statement, did they give you a chance to review it?
A. Briefly, yeah.

Q. And you reviewed the statement?
A. I didn't review—review—review it very good.
Q. But you signed it; didn't you?
A. Yeah, I just wanted to get out of there.
R. 84 at 363–64.

the gratuitous commentary nor a motion for mistrial. Additionally, counsel did not object to failure by the court to engage in a 404(b) analysis or give a limiting instruction, either at the time the offending testimony was offered or in the final jury instructions.

So, the appellate issue that emerges is whether it was plain error under Fed. R.Crim.P. 52(b), and therefore reversible error, for the court to fail to *sua sponte* give a limiting instruction as to the offending testimony, or to order it stricken from the record, in a situation where the offending testimony is *extrinsic* to the relevant testimony.[6]

In *United States v. Frady,* 456 U.S. 152, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982), the Supreme Court recognized both that the power granted by the plain error review of Rule 52(b) was to be used sparingly and that the rule's use is limited to situations where the plain error would "seriously affect the fairness, integrity, or public reputation of judicial proceedings." *Id.* at 163, nn. 13, 14, 102 S.Ct. 1584.

As a part of our plain error analysis, we have reviewed both the opening statement and the final argument presented by the government and we find no reference to the gratuitous and unsolicited commentary of Officers Ungerbuehler and Hensley.

In the context of a plain error review, we note that defendant's counsel may have decided to forego a motion for mistrial because, as a strategic decision, he preferred to test the government's case with

the jury that was impaneled [7] or may not have wished to emphasize the gratuitous commentary by a motion to strike. Against that background, we find an absence of plain error and decline to order a new trial based on the gratuitous commentary.

■ The second claim regarding the misuse of Rule 404(b) evidence by the government relates to the use of marijuana by Depew on the day of the offense. On cross-examination by Hemphill's counsel, Depew testified as follows:

Q. You use marijuana often?

A. Yes, sir.

Q. How often do you use it?

A. Daily.

Q. You still—well, you were using it daily at the time this occurred?

A. Yes, sir.

Q. Did you use it on the day it occurred?

A. On May 9th I did, but on May 8th I did not.

Q. Okay. How much did you use on a daily basis?

A. Probably half ounce, ounce, sometimes an ounce and a half.

Q. A day?

A. Yes, sir.

Q. So, you were using this at the time the robbery took place?

---

6. *United States v. Copeland,* 51 F.3d 611, 615–16 (6th Cir.), *cert. denied,* 516 U.S. 874, 116 S.Ct. 199, 133 L.Ed.2d 133 (1995), addressed the issue of whether the district court should have *sua sponte* given a cautionary instruction after unsolicited testimony was received that indicated the defendant had previously been jailed. *Copeland* found no reversible error in the failure to *sua sponte* give such a curative instruction.

7. The Supreme Court has commented on the "Hobson's choice" facing a defendant when confronted with the opportunity to move for a mistrial as well as on the judge's need for a showing of "manifest necessity" before *sua sponte* declaring a mistrial. *See Lee v. United States,* 432 U.S. 23, 32, 97 S.Ct. 2141, 53 L.Ed.2d 80 (1977).

A. Yes, sir.

R.83 at 185.

On redirect, the government's counsel elicited the following testimony:

Q. You also said you smoked some marijuana on May 9th?

A. Yes, sir.

Q. Where did you get that from?

A. It was divided between me, Stanson, and Doug. It was a half pound. We divided it into three ounces apiece.

*Id.* at 187.

No objection was entered to the redirect testimony of Depew. Hemphill's counsel was first to raise the question of Depew's use of marijuana on the day of the bank robbery and thereby opened the door to the testimony on redirect that suggested Hemphill received a portion of the marijuana on that day. Under those circumstances, in view of Depew's testimony incriminating Hemphill on the day of the bank robbery, and given Depew's position that Hemphill was the driving force behind the planning and execution of the bank robbery, there was no plain error in the district court's silence during questioning of Depew about the source of the marijuana.

### B.

 Counsel for Hemphill contends that the government's final argument misled the jury into believing that evidence of Hemphill's "prior possession" of the firearm displayed during the bank robbery was sufficient to establish proof of the § 924 violation on the day of the bank robbery. The first phase of the government's final argument about which Hemphill now complains stated:

What we know is that this Defendant had possession of that gun. And how do we know that? Well, Bobbi Jo told us

that the gun was purchased at the Defendant's direction. Bobbi Jo told us that the gun was purchased with the Defendant's money. Bobbi Jo Depew told us that Defendant was present when the gun was purchased. And Bobbi Jo Depew told us that the Defendant took possession of that gun after it was purchased. And I told you in opening statement that you'd see evidence that that Defendant used that gun. And you saw that evidence. Detective Hensley told you what happened on January 22nd at South—518 South Monument Street. Told you how he responded to the scene. Informed you that he had spoke [sic] to the Defendant. That the Defendant admitted to firing the shot. You know that that shell casing was recovered. And you've seen exclusive proof that that shell casing was in fact fired through what has been marked for identification as Government Exhibit 2.

What the evidence has shown you is that this Defendant had possession of the gun, that he provided the gun to Richard Depew to commit to use during the commission of this offense. And you remember that videotape we showed you? Is there any doubt that that firearm was brandished during the commission of this offense? Is there any doubt that that gun was used to intimidate?

R.85 at 398.

No objection to this argument was made nor does the government's argument actually contend that prior possession establishes the § 924 violation; rather, the argument was aimed at crediting Depew's testimony that Hemphill supplied him with the firearm brandished during the course of the bank robbery.

 Appellate counsel for Hemphill also objects to the following passage:

Now, with respect to the gun, when the Judge instructs you, we don't have to prove that it's the exact gun as identified in the indictment. Our burden is to show that a gun was brandished during the commission of the offense, and you'll have that video, and you'll see the pictures. There will be no doubt in your mind that the gun was brandished. And we've showed you conclusive proof that the gun that was used during the commission of that robbery was also in the possession of the Defendant prior to the robbery. As such, we respectfully request that you return a verdict of guilty—guilty of all charges. Thank you.

*Id.* at 408.

In particular, Hemphill contends that the statement, "we don't have to prove it's the exact gun as identified in the indictment," constituted a misstatement of the law.

The government argues that both challenged statements were in response to the defendant's own final argument.[8]

The claimed errors are limited to a plain error analysis. We find no such plain error.

## C.

■ Count Three of the indictment charged that both Depew and Hemphill "knowingly used, carried, and brandished a firearm, to wit, a Ruger, Model P9, Stainless .45 caliber semi-automatic pistol, *serial number 58105977,* during and in relation to a crime of violence for which they may be prosecuted in a court of the United States, that is, armed robbery of the First National Bank of Southwestern Ohio, 2299 Peck Boulevard. Hamilton, Ohio" in violation of 18 U.S.C. §§ 924(c)(1)(A)(ii) and 2. R.13 (emphasis added).

According to Hemphill, and with no dispute from the government, on the second day of the trial, the government informed the court that the serial number on the firearm at issue was not 581–059787 but rather 661–059787. The government was then allowed to introduce new evidence, not provided during discovery, to correct the discrepancy.

Hemphill labels this change as a constructive amendment to the indictment.

Our review of whether there was a constructive amendment is *de novo.* *United States v. Robison,* 904 F.2d 365, 368 (6th Cir.1990). This court defines a constructive amendment as occurring

8. As to the issue regarding the serial number of the charged handgun, Hemphill's counsel argued:

Let's talk about the gun. Stanson Hemphill's charged with a crime, involves a gun with a serial No. 581–05977. You heard from Bobbi Jo Depew. We know she said she purchased the gun. But then we heard testimony that said that the gun that was used in the commission of this offense was the gun that you're going to be presented with as evidence, and that gun has a different serial number on it.

Now, the government did try and cover this up. Brought in the ATF agent. Brought in Ms. Canniff. But the bottom line is, you have to be sure that that mistake happened. We know from Ms. Canniff—

she had no recollection of when this gun came into the pawn shop, and, again, similarly, when it left the pawn shop. She just knows that when a gun comes in, it's marked. There's a slip that's marked. It's attached to the gun, it goes into the ledger, and then that follows along. She couldn't tell us there was a mistake that was made. The government's asking you to make that leap of faith, to just assume there was a mistake that was made. And I submit to you that you can't make that leap of faith without some doubt. When you see that gun, you'll see the serial number's different, and that's going to put some doubt in your mind.

R.85 at 405.

when "the terms of the indictment are in effect altered by the presentation of evidence and jury instructions which so modify essential elements of an offense charged that there is a substantial likelihood that the defendant may have been convicted of an offense other than that charged in the indictment."
*United States v. Manning*, 142 F.3d 336, 339 (6th Cir.1998) (quoting *United States v. Hathaway*, 798 F.2d 902, 910 (6th Cir. 1986)). A constructive amendment is *per se* prejudicial and warrants reversal. *See United States v. Ford*, 872 F.2d 1231, 1235 (6th Cir.1989).

The government argues that the serial number was mere descriptive surplusage and contends that the indictment was legally sufficient without the description of the firearm and the serial number. The government cites a similar situation with an indictment involving counterfeiting that described the counterfeit bill as bearing Face Plate No. 1245, whereas the number on the bill offered into evidence was I–245. *See Simon v. United States*, 78 F.2d 454, 455 (6th Cir.1935). In *Simon*, the court found no fatal variance.

Hemphill's counsel asserts that he knew the serial number on the firearm displayed to him in discovery was different than the one described in the indictment and that he had prepared a defense aimed at showing that the firearm to be introduced in evidence by the government in support of Count Three was not the firearm described in the indictment.

We conclude that, as in *Simon v. United States, supra*, there was no fatal variance.

### D.

■ Hemphill's challenge to the sufficiency of the evidence to support his convictions requires this court to determine whether, after viewing the evidence in the light most favorable to the government, any rational trier of fact could have found that the prosecution proved the essential elements of each crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *United States v. Russell*, 76 F.3d 808, 811 (6th Cir.), *cert. denied*, 519 U.S. 841, 117 S.Ct. 121, 136 L.Ed.2d 72 (1996).

The testimony of Depew, Brown, and Witt, if believed by the jury, unequivocally supports all three convictions. Their mutually corroborating testimony leads to the conclusion that Hemphill was the moving force in planning the robbery and that he supplied the mask, the weapon brandished by Depew, and the get-a-way car. Necessary to the planning of the robbery was the cooperation of the unindicted co-conspirator Jessica Witt, who collected the funds from her window and the other two tellers while making certain that no dye pack was inserted with the collected currency. Moreover, Witt's boyfriend Douglas Brown communicated with Hemphill to advise him when the coast was clear for Depew to enter the bank and carry out the robbery. Depew offered testimony that he lost his nerve to carry out the robbery on May 8 but, with urging from Hemphill, engaged in the robbery on the next day, May 9.

Hemphill points to the testimony of his two alibi witnesses to support his claim of insufficiency and describes the testimony of Depew, Brown, and Witt as compromised by their self-interest in receiving lower sentences or, in the case of the unindicted Witt, some other favorable treatment.

The claim of insufficient evidence is patently without merit. Clearly, the jury could find from the evidence that Hemphill participated in the conspiracy, and the testimony of the three witnesses supports the accusation that Hemphill aided and abet-

ted in the commission of the crimes charged in Counts Two and Three.

## III. CONCLUSION.

Hemphill's convictions and his sentence to a term of 171 months are AFFIRMED.